UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
HYUNG JIN "SEAN" MOON,

        Plaintiff,

     - against –

HAK JA HAN MOON, HOLY SPIRIT ASSOCIATION
FOR THE UNIFICATION OF WORLD
CHRISTIANITY, THE FAMILY FEDERATION
FOR WORLD PEACE AND UNIFICATION
INTERNATIONAL, HYO YUL "PETER" KIM,
DOUGLAS D. M. JOO, CHANG SHIK YANG, KI
HOON KIM, MICHAEL W. JENKINS, MICHAEL
BALCOMB, FARLEY JONES, ALEXA WARD, AND
JOHN DOES 1-6.

        Defendants.
---------------------------------------X

**MEMORANDUM AND ORDER**

19 Civ. 1705 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Before the Court is a dispute over control of the South Korea-based Unification Church and related entities, including the Family Federation for World Peace and Unification International ("Family Federation") and the Holy Spirit Association for the Unification of World Christianity ("HSA-UWC").[1] Plaintiff Hyung Jin "Sean" Moon, the son of Unification Church founder Reverend Sun Myung Moon ("Rev. Moon") and defendant Hak Ja Han Moon ("Mrs. Moon"), brings this action to, *inter alia*, confirm that he, rather

---

[1] The Unification Church, which was founded in Seoul, Korea in 1954, is described in the operative complaint as a "religious denomination that is hierarchical." First. Am. Compl. ("FAC") at ¶ 32. Family Federation "is the authoritative religious entity that directs Unification Churches worldwide," FAC ¶ 5, and HSA-UWC (USA) is the "only embodiment of the Unification Church recognized by the Family Federation in the United States," FAC ¶ 29.

than his mother, is the rightful "Leader of Family Federation and the Unification Church as authorized and appointed by Rev. Moon." FAC ¶ 2.[2]

Before the Court are defendants' motions to dismiss. For the reasons that follow, those motions are granted in their entirety.

## I.    Background[3]

This action arises from a succession dispute that followed the death in 2012 of Unification Church founder Rev. Moon. Plaintiff alleges that defendants have engaged in a variety of tortious and conspiratorial conduct to remove plaintiff from several positions of leadership within various Unification Church organizations, including his positions as (1) International President and agent of Family Federation; (2) successor "Leader"[4]

---

[2] The Court notes at the outset that several of plaintiff's filings, see ECF Nos. 44, 71, and 91, fail to comply with the requirement of the Local Civil Rules that "all documents must have at least one-inch margins on all sides." Loc. Civ. R. 11.1(b)(2). Noncompliance with this Rule has enabled plaintiff to include more content per page than the Local Rules permit. It should go without saying that, absent permission from the Court to the contrary, plaintiff's counsel shall in all instances comply with the Local Rules of this District.

[3] The following facts are taken from the operative complaint and the documents cited therein.

[4] The complaint acknowledges that insofar as it refers to plaintiff as the "successor Leader," at the time plaintiff purportedly was appointed as Rev. Moon's successor "[t]here was not a specific officer title reserved for this highest position of leadership in the Family Federation and the Unification Church worldwide," and that "in the context of the church [plaintiff] was also referred to as heir, king, successor, and other titles which reflected that he was the appointed successor of Rev. Moon intended to serve as the top Leader of the church worldwide." FAC ¶ 49. In plaintiff's opposition to defendants' motions to dismiss, plaintiff further describes his role as "Leader" of Family Federation as "the equivalent of a chief executive officer." ECF No. 71 at 26.

of the Unification Church and Family Federation; and (3) President of HSA-UWC (USA).

The relevant events began in April of 2008, when Rev. Moon appointed plaintiff to the position of International President of Family Federation. FAC ¶ 39. Thereafter, by way of three "coronation ceremonies" held in January of 2009, Rev. Moon publicly confirmed plaintiff's appointment to the post of "successor Leader of Family Federation and the Unification Church worldwide." FAC ¶ 48. Plaintiff's appointment as successor to Rev. Moon, which plaintiff alleges was separate from and in addition to plaintiff's appointment as International President of Family Federation, FAC ¶ 53, was further confirmed in 2010, when Rev. Moon purportedly "prepared and signed a written proclamation in which he appointed Sean Moon as his rightful heir, successor and Leader of the Unification Church worldwide,"[5] FAC ¶ 52. Based on the allegations in the complaint and the materials annexed thereto, that proclamation is believed to state, in relevant part:

> There is only one King of Kings, who is God, only one True Parents, throughout tens of thousands of generations, all families are the people who share a single lineage, and are

---

[5] The complaint goes on to state that "[a] true and correct copy of [the written proclamation] as translated from Korean, is attached as Exhibit 1." FAC ¶ 52. Exhibit 1 to the complaint, however, appears to be a transcript of a conversation during which Rev. Moon drafted the purported proclamation, rather than a copy of the proclamation itself. See FAC Ex. 2. The transcript, titled "June 5 Proclamation with Translation Added," reflects a conversation between Rev. Moon, Mrs. Moon, and plaintiff, who are identified in the transcript as "Father," "Mother," and "Hyung Jin Nim," respectively. Further, while the transcript is titled "June 5 Proclamation," the transcript indicates that the written proclamation was signed on April 23, 2010. See FAC Ex. 1 at 2.

the children of one heavenly kingdom. They have the same
blood lineage. The Universal Peace and Unification
Federation Headquarters is the absolute and unique
Headquarters. There cannot be two Headquarters . . . Its
representative and inheritor is Hyung Jin Moon. Anybody else
is a heretic and a destroyer. This is the proclamation of
the True Parents.

FAC Ex. 1 at 2.

Plaintiff further alleges that, after Rev. Moon's death,
defendant Mrs. Moon "coerced [plaintiff] to leave Korea and move
to the United States to serve as President of HSA-UWC (USA)."
FAC ¶ 73. Thereafter, on February 23, 2013, the board of HSA-UWC
(USA) voted to remove Sean Moon as President of that organization.
FAC ¶ 76. Plaintiff remained International President of Family
Federation until February of 2015, when, in "direct retaliation"
for having exposed certain misdeeds of top management of Family
Federation, FAC ¶¶ 83, 263, plaintiff purportedly was suspended
from that role. Plaintiff maintains that, notwithstanding
defendants' attempts to remove him from various positions of
leadership within the Unification Church, he remains Rev. Moon's
successor and "Leader" of Family Federation because Rev. Moon
irrevocably appointed him to that role and "[t]here is no
executive, board of directors, or other entity or individual with
authority to revoke Rev. Moon's appointment of Sean Moon as Leader
of Family Federation and the Unification Church." FAC ¶ 91.

Plaintiff also alleges that defendants Family Federation and
Mrs. Moon have published certain false statements "disput[ing]

[plaintiff's] proper authority to lead the Family Federation and Unification Church as the Leader." FAC ¶ 209. While the complaint fails to identify the specific statements that plaintiff maintains are defamatory, plaintiff attaches as exhibits to the complaint: (1) an April 18, 2015 letter from Family Federation, signed by defendants Dr. Ki Hoon Kim and Dr. Michael Balcomb,[6] FAC Ex. 3; and (2) a February 22, 2018 Family Federation press release, FAC Ex. 4. The 2015 letter states, *inter alia*, that "[i]n [plaintiff's] current state of rebellion against True Parents, Hyung Jin Moon by his own words and actions renounced and repudiated his position as heir and representative of True Parents." FAC Ex. 3 at 3. The 2015 letter goes on to state that "because True Parents removed [plaintiff] from his former position as International President, Hyung Jin Moon has no official authority and position within our movement at this time." FAC Ex. 3 at 3. The 2018 press release states that "[s]ince the death of Rev. Moon back in 2012, Family Federation has been led by Mrs. Hak Ja Han Moon, the co-founder." FAC Ex. 4 at 2. The press release concludes with Family Federation's mission statement: "To guide

---

[6] According to the FAC, defendant Dr. Ki Hoon Kim is the Continental Director, Regional Chairman and Vice President of Family Federation in North America, and was appointed chairman of the HSA-UWC Board of Directors "after Sean Moon's improper removal." FAC ¶ 12. Defendant Dr. Michael Balcomb is also alleged to have been a member of the HSA-UWC (USA) Board of Directors at the time of plaintiff's removal, and the complaint alleges upon information and belief that Dr. Balcomb "continues to serve in a leadership role on behalf of Family Federation, HSA-UWC (USA) and the Unification Church." FAC ¶ 14.

America back to God through the teachings and Marriage Blessing of True Parents." FAC Ex. 4 at 3.

Finally, plaintiff asserts that as part of defendant Mrs. Moon's efforts to usurp plaintiff's authority, Mrs. Moon created the "Cheon II Guk Constitution," which established a "Supreme Council" to participate in the selection of future heads of the Unification Church following Mrs. Moon's death. FAC ¶ 117. Plaintiff claims that because he did not authorize the Cheon II Guk Constitution or the creation of the Supreme Council, both the Cheon II Guk Constitution and the Supreme Council are without legal effect. FAC ¶ 119.

## A. Procedural History

Plaintiff filed the initial complaint in this case on February 22, 2019 against defendants Mrs. Moon, HSA-UWC, Family Federation, and eight individually named defendants believed to be "senior members of HSA-UWC and/or Family Federation." ECF No. 1 at ¶ 65. On April 15, 2019, the defendants that had been served filed a letter requesting a pre-motion conference in connection with their anticipated motion to dismiss. ECF No. 33. In response, plaintiff requested leave to conduct discovery as to the personal jurisdiction arguments raised by the defendants in their April 15 letter. On May 22, 2019, after this case was transferred to the

undersigned,[7] the Court issued an Order declining plaintiff's request for jurisdictional discovery but granting plaintiff leave to file an amended complaint if, consistent with Rule 11, plaintiff could assert additional allegations to cure the deficiencies asserted in defendants' April 15 letter. ECF No. 41.

Plaintiff thereafter filed a 275-paragraph amended complaint asserting twelve causes of action against the initially named defendants. Two of plaintiff's claims seek declaratory relief: (1) that plaintiff "is the properly authorized and appointed successor and worldwide Leader of the Unification Church and Family Federation," FAC ¶ 112 (Count I); and (2) that "the Cheon II Guk Constitution is a legal nullity, void, without authority, unenforceable and without effect" and that "the Supreme Council is not properly authorized and is without legal authority to govern the conduct or operation of Family Federation or the Unification Church and should be immediately disbanded," FAC ¶¶ 119, 120 (Count II). Plaintiff additionally asserts causes of action for breach of fiduciary duty (Counts III and IV); tortious interference with business relationship (Count V); breach of agency agreement (Count VI); breach of fiduciary duties, unjust enrichment, and constructive trust (Count VII); defamation (Count VIII); and civil

---

[7] The complaint was initially filed in the Southern District of New York, White Plains division. The case was transferred to this Court on May 20, 2019, following a determination that assignment to White Plains was improper.

RICO violations and conspiracy to commit RICO violations (Counts IX and X). Plaintiff also asserts a claim for violation of New York's Whistleblower Statute (Count XI), and seeks an accounting related to HSA-UWC and Family Federation (Count XII).

On June 28, 2019, defendants Mrs. Moon, HSA-UWC, Family Federation, and Dr. Ki Hoon Kim moved to dismiss the FAC for lack subject matter jurisdiction, lack of personal jurisdiction as to all defendants except HSA-UWC, and failure to state a claim. ECF No. 50. The Court thereafter granted leave for defendant Dr. Michael Balcomb, for whom proof of service was filed on July 1, 2019, to join the June 28 motion to dismiss and to file a supplemental brief addressing issues unique to him.[8] Both motions to dismiss are presently before the Court. Also before the Court is plaintiff's motion to extend the ninety-day service deadline under Federal Rule of Civil Procedure 4(m) as to certain of the individual defendants, and to excuse untimely service on

_____

[8] As of June 28, 2019, the docket reflected that four of the eleven named defendants -- Mrs. Moon, HSA-UWC, Family Federation and Dr. Ki Hoon Kim -- had been served. Because the July 1, 2019 proof of service as to Dr. Balcomb reflected that he had been served on June 27, 2019, the Court granted him leave to file a supplemental motion to dismiss. See ECF No. 55. In addition to moving to dismiss on the bases set forth in the June 28 motion to dismiss, Balcomb also moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(5), on the basis of untimely service.

On August 14, 2019, counsel for the served defendants informed the Court that three of the additionally named defendants (i.e., Douglas D.M. Joo, Chang Shik Yang, and Michael Jenkins) had recently been served. See ECF No. 74. In the interest of avoiding duplicative briefing, the Court stayed the case as to those defendants pending resolution of the previously filed motions to dismiss. See ECF No. 76. At present, the docket reflects that all but one of the named defendants have been served.

defendants Douglas D.M. Joo, Chang Shik Yang, and Michael Jenkins. See ECF No. 75.

For the reasons stated herein, the Court grants defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).[9]  Plaintiff's motion to extend the 90-day service deadline and to excuse the late service upon the additionally named defendants, is, accordingly, denied as moot.

## II. Discussion

Because the crux of plaintiff's multi-count complaint is his request for a declaration that he, rather than his mother, "is the properly authorized and appointed successor and worldwide Leader of the Unification Church and Family Federation," FAC ¶ 112, the Court begins by considering whether, as defendants maintain, the doctrine of ecclesiastical abstention bars the Court from adjudicating that claim.  After concluding that the Court may not resolve that dispute without running afoul of the First Amendment, the Court considers whether any of plaintiff's remaining claims can be adjudicated by reference to neutral principles of law. Because each of the remaining claims either turns on or cannot be divorced from the issue of whether plaintiff is entitled to the position of "successor Leader" of the Unification Church -- a

---

[9] As used herein, "defendants" refers to the defendants who have filed motions to dismiss (i.e., Mrs. Moon, HSA-UWC, Family Federation, Dr. Ki Hoon Kim, and Dr. Michael Balcomb).

question that this Court may not resolve without wading impermissibly into questions of ecclesiastical concern -- plaintiff's remaining claims must also be dismissed.

Indeed, notwithstanding plaintiff's efforts to cast this proceeding as a "classic corporate dispute" resolvable by reference to neutral principles of law, ECF No. 71 at 2, this matter is, at bottom, the latest chapter in a protracted controversy over who should replace the late Rev. Moon as leader of the Unification Church. Because this Court may not, consistent with the First Amendment, intervene in that dispute, plaintiff's complaint must be dismissed in its entirety for lack of subject matter jurisdiction.[10]

### A. Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." _Makarova v. United States_, 201 F.3d 110, 113 (2d Cir. 2000). "In defending a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears

---

[10] Consistent with the longstanding practice of treating questions of ecclesiastical entanglement as jurisdictional, see _Watson v. Jones_, 80 U.S. 679, 733 (1871) (stating that "civil courts exercise no jurisdiction" over a matter that is "strictly and purely ecclesiastical in its character"), the Court analyzes defendants' ecclesiastical abstention arguments through a Rule 12(b)(1) lens. _See also_ _Kavanagh v. Zwilling_, 12 Civ. 7062 (JMF), 997 F. Supp. 2d 241, 248 n.7 (S.D.N.Y.), aff'd, 578 F. App'x 24 (2d Cir. 2014) ("Most district courts to consider the question [of whether the First Amendment bars review of ecclesiastical questions] have treated it as jurisdictional.").

the burden of proving the Court's jurisdiction by a preponderance of the evidence." Id. While the Court "must accept as true all material factual allegations in the complaint," J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004), "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). Moreover, the Court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue." Attica, 386 F.3d at 110.

"Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990) (internal quotation marks omitted). The Court thus begins by considering defendants' argument that "[t]he First Amendment ecclesiastical abstention doctrine bars this Court from exercising jurisdiction over a dispute about who controls a church and its assets." ECF No. 50 at 5. Because the Court concludes that dismissal on that basis is warranted, the Court does not reach defendants' other arguments for dismissal.

**B.    Ecclesiastical Abstention**

Defendants' motions to dismiss draw on a long line of Supreme Court cases holding that the First Amendment precludes judicial review of proceedings that turn on issues of church administration or religious doctrine.  In 1871, the Supreme Court in <u>Watson v. Jones</u> articulated as a matter of federal common law the principle, "founded in a broad and sound view of the relations of church and state under our system of laws," that civil courts are to defer to religious authorities on "questions of [church] discipline, or of faith, or ecclesiastical rule, custom, or law."  80 U.S. 679, 727 (1871).  The Supreme Court constitutionalized the principle from <u>Watson</u>, which had been decided without explicit reference to the First Amendment, in <u>Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.</u>, 344 U.S. 94, 116 (1952).  Since <u>Kedroff</u>, the doctrine of ecclesiastical abstention, variously referred to as the "church autonomy doctrine," has continued to evolve (albeit somewhat sporadically) on a case-by-case basis.[11]  <u>See, e.g.</u>, <u>Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church</u>, 393 U.S. 440, 449, 451 (1969) (reciting the principle that civil courts may not resolve questions that would require them "to engage in the forbidden process of interpreting

---

[11] While unimportant for purposes of this Memorandum and Order, there remains some ambiguity over whether the ecclesiastical abstention doctrine derives from the Free Exercise Clause or the Establishment Clause.  <u>See</u> <u>Kavanagh</u>, 997 F. Supp. 2d at 250.

and weighing church doctrine" and citing the "hazards . . . of
implicating secular interests in matters of purely ecclesiastical
concern"); <u>Serbian E. Orthodox Diocese for U.S. of Am. & Canada v.</u>
<u>Milivojevich</u>, 426 U.S. 696, 713 (1976) (asserting "the general
rule that religious controversies are not the proper subject of
civil court inquiry").[12]   Most recently, the Supreme Court in
<u>Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.</u>
affirmed that "the authority to select and control who will
minister to the faithful—a matter 'strictly ecclesiastical,'—is
the church's alone."   565 U.S. 171, 195 (2012) (quoting <u>Kedroff</u>,
344 U.S. at 119 (1952)).[13]

---

[12] While plaintiff notes correctly that "[t]he First Amendment generally
prevents courts from ruling on the truth of religious beliefs and courts cannot
interpret religious doctrine," ECF No. 71 at 4, the case law is clear that
issues pertaining to internal church organization and governance, no less than
questions of "religious beliefs" and "religious doctrine," <u>id.</u>, are to be
regarded as religious matters beyond the purview of civil courts' authority.
<u>See, e.g.</u>, <u>Milivojevich</u>, 426 U.S. at 717 (deeming it "[beyond] dispute that
questions [concerning] the composition of the church hierarchy [are] at the
core of ecclesiastical concern"); <u>Kedroff</u>, 344 U.S. at 116 (affirming the
freedom of religious organizations "to decide for themselves, free from state
interference, *matters of church government* as well as those of faith and
doctrine") (emphasis added).

[13] While <u>Hosanna-Tabor</u> was not a case about ecclesiastical abstention, it
addressed "the related--but distinct-–'ministerial exception,'" <u>Kavanagh</u>, 997
F. Supp. 2d at 248 n.7, which "protects religious employers from employment
discrimination lawsuits brought by their ministers." <u>Penn v. N.Y. Methodist</u>
<u>Hosp.</u>, 884 F.3d 416, 418 (2d Cir. 2018). While plaintiff notes correctly that
this is not an employment discrimination lawsuit and thus that cases concerning
the ministerial exception are not directly relevant, <u>see</u> ECF No. 71 at 8,
<u>Hosanna-Tabor</u> is instructive insofar as it articulates the rationale behind
judicial non-interference in disputes over church leadership. As the Court in
<u>Hosanna-Tabor</u> explained, "[r]equiring a church to accept or retain an unwanted
minister, or punishing a church for failing to do so . . . interferes with the
internal governance of the church, depriving the church of control over the
selection of those who will personify its beliefs." 565 U.S. at 188.

While the ecclesiastical abstention doctrine has evolved principally in the context of church property disputes, the Supreme Court in _Milivojevich_ recognized a distinct category of cases involving religious organizations -- those involving questions "at the core of ecclesiastical concern," _id._ at 717 -- that, though they may incidentally affect church property or other secular matters, cannot properly be adjudicated by civil courts.[14]   And while the line separating such claims from the secular church disputes that civil courts permissibly may adjudicate is often a blurry one, _see_ _Kavanagh_, 997 F. Supp. 2d at 252, courts have generally concluded that intrachurch succession disputes, such as the one at issue here, fall squarely within the nonjusticiable category.   _See, e.g._, _Congregation Beth Yitzhok v. Briskman_, 566 F. Supp. 555, 558 (E.D.N.Y. 1983) (dismissing the complaint for lack of subject matter jurisdiction where resolution of the legal issues would require the court to determine the rightful successor to a deceased religious leader); _Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar_, 179 F.3d 1244, 1250 (9th Cir. 1999)(explaining that any decision concerning the legitimacy of a religious leader's succession "could only be made by a recognized

---

[14] Professor Larry Tribe has explained that the Supreme Court in _Serbian Eastern Orthodox Diocese v. Milivojevich_ "settled a question left open by the Court's prior decisions: whatever room the first amendment might leave for independent civil resolution of secular but church-related disputes . . . it leaves no room whatever for independent civil adjudication of 'questions . . . at the core of ecclesiastical concern.'").   LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1241 (3d ed. 2000) (quoting _Milivojevich_, 426 U.S. at 717).

decision-making body" within the religious organization itself);
Kabbalah Ctr. Int'l, Inc. v. Youdkevitch, 2008 WL 11336117, at *6
(C.D. Cal. Oct. 30, 2008) (stating that the court could not
adjudicate the claim that defendants had falsely held out one of
the named defendants as the successor to the founder of a religious
organization because doing so "would require the Court to apply
religious doctrine or principles").

Nevertheless, the application of the ecclesiastical
abstention doctrine is fact-specific, and civil courts may
adjudicate secular issues that arise in the context of church
disputes "when inquiry 'into religious law and polity' is not
required." Kavanagh, 997 F. Supp. 2d at 249-50 (quoting Ram v.
Lal, 906 F. Supp. 2d 59, 69-70 (E.D.N.Y. 2012)). To that end, the
Supreme Court has articulated two methods -- deference to a
church's highest decision-making authority (the "deference
approach") and the "neutral principles of law" approach -- by which
civil courts can adjudicate church disputes "without resolving
underlying controversies over religious doctrine." Presbyterian
Church, 393 U.S. at 449. Because the two methods provide a useful
framework for analyzing this dispute, each is addressed in turn.

### 1.   Deference to Ecclesiastical Authority

Under the deference approach, courts avoid entanglement in
disputes concerning internal church governance by deferring to the
decisions of the religious organization's established decision-

making body.[15]  While the Supreme Court in <u>Milivojevich</u> originally suggested a rule of compulsory deference to the decisions of authoritative church bodies where such decisions had been made, <u>see</u> 426 U.S. at 79 (noting that "[c]ivil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity"),[16] the Supreme Court in <u>Jones v. Wolf</u> acknowledged that compulsory deference would prove difficult in cases where a religious organization's authoritative decision-making body could not easily be identified.  Rejecting the principle of compulsory deference advocated by the dissenting justices, the <u>Jones v. Wolf</u> majority explained that, "where the locus of control [is] ambiguous . . . [compulsory deference] would appear to require 'a searching and therefore impermissible inquiry

---

[15] In accordance with this principle, courts have recognized that the First Amendment "permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." <u>Milivojevich</u>, 426 U.S. at 724.  Religious bodies, in turn, have developed institutions capable of adjudicating intra-church disputes. <u>See</u> Michael A. Helfand, *Litigating Religion*, 93 B.U. L. REV. 493, 498 (2013) ("In practice, religious communities have largely filled the void left by the judicial refusal to decide cases implicating religion by developing institutions capable of doing so.").

[16] The Supreme Court's ecclesiastical abstention jurisprudence has long distinguished between churches that are "hierarchical" and those that are "congregational" in structure.  "Hierarchical" churches are churches that have "a common ruling convocation or ecclesiastical head." <u>Kedroff</u>, 344 U.S. 94, 110 (1952).  "Congregational" churches, by contrast, "generally [do not] recognize superior authority over the local congregation."  Arlin M. Adams & William R. Hanlon, *Jones v. Wolf:  Church Autonomy and the Religion Clauses of the First Amendment*, 128 U. PA. L. REV. 1291, 1292 (1980).  For present purposes, the complaint alleges, and the Court accepts as true, that the Unification Church is hierarchical in nature.  FAC ¶ 32.

into church polity.'" *Jones*, 443 U.S. at 605 (quoting *Milivojevich*, 426 U.S. at 723).

Where, as here, there is a dispute as to the identity of a religious organization's authoritative decision-making body, the deference approach –– which requires the Court to identify in the first instance the body to whom it may defer –– cannot be applied without engaging in precisely the sort of "impermissible inquiry into church polity" that the Supreme Court anticipated in *Jones v. Wolf*. Stated otherwise, "where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy." *Maryland & Virginia Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 369–70 (1970). *See also Briskman*, 566 F. Supp. 555 at 558 (concluding that, because a "dispute exists as to who is entitled to succeed the late [religious leader]. . . it is impossible for this Court to resolve the controversy without first wading deeply (and impermissibly) into religious issues.").[17]

---

[17] Defendants describe *Serbian Eastern Orthodox Diocese v. Milivojevich* as the "leading case" in support of their argument that plaintiff's claims are barred by the First Amendment ecclesiastical abstention doctrine. ECF No. 50 at 5. In *Milivojevich*, however, there was no dispute over which religious entities held "the exclusive power to remove, suspend, defrock, or appoint Diocesan Bishops," 426 U.S. at 699, thus entitling the decisions of those entities to judicial deference.

In short, the deference approach presupposes that the identity of the church's authoritative decision-making body is undisputed. Because the central question before the Court is whether plaintiff or his mother is properly entitled to succeed Rev. Moon, thus rendering the identification of the authoritative decision-making body a matter of "substantial controversy," Sharpsburg, 396 U.S. at 369, the deference principle is of limited utility in resolving this action.[18]

### 2. Neutral Principles of Law

The alternative method for resolving secular disputes involving religious entities, and the approach plaintiff urges the Court to adopt, permits civil courts to resolve disputes to the extent they are amenable to the application of neutral principles of law. See Jones, 443 U.S. at 603 (explaining that the neutral principles approach permits civil courts to resolve church property disputes when they can do so by "rel[ying] exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges").

---

[18] The Court thus disagrees with defendants' contention that because Family Federation "has determined that Reverend Moon's widow, not Plaintiff Sean Moon, is the leader of the Unification Church . . . this Court lacks jurisdiction to hold otherwise." ECF No. 87 at 5-6. Insofar as the parties agree that Family Federation is the authoritative religious body within the Unification Church, see FAC ¶ 5, they disagree over who is the legitimate leader of that entity and thus over the identity of the proper decision-making authority.

At least in the context of a church property dispute,[19] the preliminary inquiry under the neutral principles approach is to evaluate whether church documents (*e.g.*, church charters or constitutions) contain secular language that civil courts may interpret in order to resolve the dispute on a non-theological basis. See, e.g., id. ("Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy."). Here, however, plaintiff concedes that there exists neither a "charter [n]or [any other] governing documents . . . that would govern how or whether Sean Moon could be removed as the Leader and successor of Rev. Moon." FAC ¶ 87. While plaintiff alleges that his appointment as successor Leader is "evidenced in a written proclamation," FAC ¶ 2, that proclamation, discussed *supra* at 3-4, turns on the

---

[19] The Court assumes for purposes of this Memorandum and Order that the neutral principles approach -- a well-established method for resolving church *property* disputes, see, e.g., Jones, 443 U.S. at 604 (noting that states may "adopt neutral principles of law as a means of adjudicating *a church property dispute*") (emphasis added); Presbyterian Church, 393 U.S. at 449 (describing "neutral principles of law, *developed for use in all property disputes*") (emphasis added) -- may also be applied to other kinds of secular disputes involving religious entities. See, e.g., Puri v. Khalsa, 844 F.3d 1152, 1165 (9th Cir. 2017) ("Property disputes have proved especially amenable to application of the neutral-principles approach. But we are unaware of any authority or reason precluding courts from deciding other types of church disputes by application of purely secular legal rules"). Here, notwithstanding plaintiff's purported entitlement to certain church property -- namely, the "crowns and robes which were part of the required attire in the commencement of his duties," FAC ¶ 160 -- plaintiff does not characterize this proceeding as a church property dispute (nor could he credibly do so).

meaning of plainly non-secular terms and concepts (*e.g.*, the "one King of Kings, who is God"), and an understanding of the authority of the "True Parents" within the Unification Church movement. It suffices to say that this Court could not ascertain the meaning of those concepts -- nor the significance of Rev. Moon's purported admonition that "anybody [other than plaintiff] is a heretic and a destroyer," FAC Ex. 1 at 2 -- by reference to ordinary principles of contract interpretation.[20]

Citing a 1963 opinion of the New York Supreme Court, Bronx County, plaintiff maintains that in the absence of governing documents that would permit a court to resolve a church dispute on a secular basis, courts can still apply the neutral principles approach by "rely[ing] on [a religious entity's] 'accepted and honored custom, policies, and usage' to determine the rights of the parties.'" ECF No. 71 at 5 (quoting <u>Evans v. Criss</u>, 240 N.Y.S. 2d 517, 520 (N.Y. Sup. Ct. 1963)). In an apparent effort to identify a Unification Church practice that this Court could enforce in order to affirm plaintiff's status as "Leader," plaintiff asserts that "[p]ursuant to the customs, policies and procedures of [Family Federation], Rev. Moon had unilateral

---

[20] Nor is the Court persuaded by plaintiff's contention that "Rev. Moon was very intentional in making his appointment of Sean Moon irrevocable and on neutral principles of non-profit and/or corporate law such appointment cannot be revoked as there is no one with authority to do so." FAC ¶ 93. Plaintiff fails to identify the specific principles of "corporate and/or non-profit law" that supposedly would aid this Court in resolving his claims.

authority to appoint and remove the heads of [Family Federation and HSA-UWC]." ECF No. 71 at 3.

Even if Rev. Moon's "unilateral authority" over the selection and removal of Unification Church leaders could accurately be characterized as an "accepted and honored custom," any such custom would not aid this Court's evaluation of the legitimacy of plaintiff's removal from various church leadership positions following Rev. Moon's death. Insofar as Rev. Moon founded the Unification Church and acted as its first spiritual leader, the Unification Church has had no prior occasion to establish an "accepted and honored custom" for selecting its successor leaders. Furthermore, the 1963 New York state court opinion that plaintiff cites as authority for the proposition that church disputes may be resolved by reference to prior customs and practices expressly premised its reliance on the church's prior practices on the fact that the church in question was congregational rather than hierarchical in structure. The court reasoned that:

> Unlike other religious denominations, there is no central governing body in the Baptist faith. Thus, *inasmuch as there exists no superior ecclesiastical entity vested with the power to prescribe rules by which a Baptist church may appoint or discharge a pastor,* past and accepted customs must be relied upon as the basis for effecting designations and discharges.

Id. (emphasis added). As noted *supra* at 16 n.16, the Unification Church is hierarchically structured (*i.e.*, it possesses a "central

governing body" in Family Federation).  Thus, the state court's reasoning is factually inapplicable to this proceeding.

In summary, whether plaintiff or his mother is the rightful successor to Rev. Moon as leader of the Unification Church -- a question that the case law suggests is "at the core of ecclesiastical concern," Milivojevich, 426 U.S. at 717 -- simply cannot be resolved via the deference approach or by reference to neutral principles of law.  Thus, Count I of plaintiff's complaint must be dismissed as barred by the First Amendment.  It follows that plaintiff's request for a declaration that the Cheon II Guk Constitution and the Supreme Council are "without legal authority," see FAC ¶¶ 119, 120 (Count II) -- a request premised solely upon plaintiff's contention that he, rather than his mother, is the true "Leader" of the Unification Church -- must also be dismissed.

## C.    Plaintiff's Remaining Claims

In an effort to characterize this proceeding as one that this Court can adjudicate, plaintiff alleges a variety of business torts arising from his purportedly improper ouster as International President of Family Federation.[21]  It is well-settled, however, that "[i]n cases involving a dispute between two or more religious

---

[21] Indeed, plaintiff characterizes this proceeding as a secular dispute concerning "whether [Rev. Moon] had authority under the organization's practices and procedures to appoint Sean Moon as [Family Federation's] agent, whether he did in fact appoint him, and whether that agency agreement has been tortiously interfered with and/or breached."  ECF No. 71 at 2.

factions, the Court must look beyond the allegations of the complaint to ascertain what lies at the heart of [the] controversy." Kedroff, 344 U.S. at 122 (1952) (Frankfurter, J., concurring). See also Kavanagh, 997 F. Supp. 2d at 250–51 (noting that, to determine whether the First Amendment permits adjudication of claims involving religious entities, civil courts rely not "on conclusory labeling of the whole dispute as either 'secular' or 'ecclesiastical,' but rather on the specific elements of the plaintiffs' claim[s]") (internal quotation marks omitted).

Here, a review of plaintiff's claims leads inescapably to the conclusion that to resolve the allegations in the complaint would require resolution of the threshold question, discussed at length *supra*, of whether plaintiff or defendant Mrs. Moon is the rightful successor to Rev. Moon. And because that inquiry is barred by the First Amendment ecclesiastical abstention doctrine, those claims must be dismissed for want of subject matter jurisdiction, *even if those claims would otherwise be justiciable by reference to neutral principles.* Cf. Russian Orthodox Convent Novo-Diveevo, Inc. v. Sukharevskaya, 166 A.D.3d 1036, 1039 (N.Y. App. Div. 2018) (concluding that the existence of threshold ecclesiastical issues that directly affected the secular issues before the court prohibited the court from resolving the secular issues "that would otherwise have been subject to neutral principles of law").

For the avoidance of doubt, the Court briefly addresses plaintiff's remaining claims.[22]

### 1.  Breach of Fiduciary Duty

Plaintiff alleges that "[a]t all relevant times . . . Mrs. Moon has owed the Unification Church, Family Federation, HSA-UWC (USA), and Sean Moon a fiduciary duty to act in their best interests by virtue of her public role as Rev. Moon's wife, Sean Moon's mother and the role she claims as 'True Mother' and her influence over the entities as a result."  FAC ¶ 123.  Plaintiff further alleges that his mother's breach of her purported fiduciary duties "is ongoing as she continues to purport to be the Leader of Family Federation and the Unification Church in direct disobedience, disrespect and disregard of Rev. Moon's express appointment of Sean Moon as Leader."  FAC ¶ 129.

---

[22] Plaintiff devotes multiple pages of his opposition to defendants' motions to dismiss to explaining why Family Federation's arguments in favor of ecclesiastical abstention in this case are "disingenuous" in light of the fact that, in an unrelated lawsuit, Family Federation, as plaintiff, argued successfully *against* dismissal on the basis of ecclesiastical abstention.  See ECF No. 71 at 4-6; Family Fed'n for World Peace v. Hyun Jin Moon, 129 A.3d 234 (D.C. Cir. 2015).  If anything, that case -- which did not, as here, require the court to resolve a church leadership dispute -- is supportive of the conclusion that this Court lacks jurisdiction over the claims asserted in plaintiff's complaint.  Indeed, in reversing the trial court's dismissal for lack of subject matter jurisdiction, the D.C. Circuit reasoned that the suit was not "directly against a church, synagogue, or mosque or their immediate leadership . . . Nor does it appear that the individual defendants have a direct religious role within the church as such, but rather are basically operating in a secular capacity."  Id. at 249.  Here, Family Federation -- an organization whose mission statement is "[t]o guide America back to God through the teachings and Marriage Blessing of True Parents," FAC Ex. 4 at 3 -- is described in the FAC as the Unification Church's "authoritative *religious entity*," id. at ¶ 5 (emphasis added).  Further, defendants are being sued not for actions taken in a secular capacity but for, *inter alia*, facilitating "modifications of church doctrines," FAC ¶¶ 81, 261.

Even assuming that plaintiff could plausibly allege a fiduciary relationship with his mother, any evaluation of the behavior that purportedly constitutes the fiduciary breach -- *inter alia*, Mrs. Moon "wrongfully holding herself out to be the Leader of the Unification Church and Family Federation," and "misrepresenting her role, authority, and status to members of the organizations," FAC ¶ 126 -- would require an inquiry into the threshold issue of whether Mrs. Moon, rather than plaintiff, is the rightful successor to the late Rev. Moon. The same is true with respect to the claimed wrongdoing by the director defendants, who allegedly breached their purported fiduciary duties to plaintiff by, *inter alia*, "refus[ing] to honor . . . Rev. Moon's appointment of Sean Moon as his successor Leader and agent of HSA-UWC (USA) and all Family Federation organizations." FAC ¶¶ 134-40. Because the alleged breaches are inextricably linked to the ecclesiastical determination of who is the legitimate leader of the Unification Church, plaintiff's breach of fiduciary duty claims must be dismissed.[23]

---

[23] State and federal courts have often been reluctant to adjudicate allegations of intra-church fiduciary violations on the grounds that doing so presumes that the secular concept of a "fiduciary" is capable of fully capturing the nature of a fundamentally non-secular relationship. See, e.g., Schmidt v. Bishop, 779 F. Supp. 321, 326 (S.D.N.Y. 1991) (noting the "constitutional difficulties" that the court would encounter "in analyzing and defining the scope of a fiduciary duty owed persons by their clergy"). But see Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 430-31 (2d Cir. 1999) (concluding in the context of a sexual assault claim that a jury could find the Diocese liable for breaches of a fiduciary duty owed to a parishioner without impermissibly inquiring into religious issues). The Second Circuit's reasoning in Martinelli relied, however, upon the distinction "between consideration of

### 2. Tortious Interference

Plaintiff alleges tortious interference with plaintiff's relationship with Family Federation based upon defendants' "interfer[ence] with Sean Moon's rightful authority to act as Leader of Family Federation and Unification Church." FAC ¶ 169. Assuming, *arguendo*, that plaintiff could plausibly allege a tortious interference claim in this context, any such claim would have accrued in February 2015 when plaintiff purportedly was suspended from his role as International President of Family Federation. FAC ¶ 263. Because plaintiff filed the initial complaint over three years after his alleged suspension, any tortious interference claim is time-barred. NY CPLR § 214(4).[24]

### 3. Civil RICO

Plaintiff alleges a civil RICO claim based on defendants' "fraudulent scheme . . . to steal control of the Unification Church and Family Federation from Sean Moon." FAC ¶ 69. Assuming, *arguendo*, that plaintiff could adequately plead civil RICO violations under 18 U.S.C. § 1962(b) that are not time-barred, any

---

religious teachings and tenets as brute facts, which is permissible under the First Amendment, and evaluation of their validity, which is not." <u>Kavanagh</u>, 997 F. Supp. 2d at 254. Plaintiff's breach of fiduciary claims are distinguishable from those alleged in <u>Martinelli</u> because plaintiff's claims would require consideration of the validity of plaintiff's status as "Leader."

[24] Plaintiff attempts to save this claim by alleging that defendants' interference is "*continuing* and *ongoing*," ECF No. 71 at 28 (emphasis in original). This argument is unavailing, however, because tortious interference is not a "continuing tort." <u>Enzo Biochem, Inc. v. Amersham PLC</u>, No. 02 Civ. 8448 (RJS), 981 F. Supp. 2d 217, 225 (S.D.N.Y. 2013) (internal quotation marks omitted).

such violations could not be disentangled from the threshold determination of whether plaintiff is the "Leader" of the Unification Church. <u>See</u> FAC ¶ 221(c) ("To execute their fraudulent scheme, Defendants caused documents to be sent and delivered through the United States mail, to followers of the Unification Church and Family Federation falsely stating that Sean Moon was not the Leader, each of which constitutes a separate violation of 18 U.S.C. § 1341 and a separate act of racketeering activity"); FAC ¶ 221(f) ("To execute their fraudulent scheme, Defendants caused numerous writings, signs, signals, pictures, or sounds to be transmitted by means of wire, radio, or television communications to followers of the Unification Church and Family Federation falsely stating that Sean Moon was not the Leader, each of which constitutes a separate violation of 18 U.S.C. § 1343").[25] In short, plaintiff's RICO claims turn on the Court's resolution of the succession dispute, since the alleged acts of racketeering activity presume plaintiff's status as "Leader."

In dismissing a RICO claim arising from a religious succession dispute not dissimilar to the one at issue here, the court in <u>Congregation Beth Yitzhok v. Briskman</u> explained that "an issue of

---

[25] While the Court need not address whether plaintiff has adequately pled the elements of a civil RICO claim, much less the merits of any such claim, it regards with some skepticism plaintiff's attempt to cast a dispute of this nature as a RICO violation in the first instance. <u>Cf.</u> <u>Briskman</u>, 566 F. Supp. 555, 557 (E.D.N.Y. 1983) ("The core of this litigation is an internecine dispute between rival religious factions. If there can be a case that should not be covered by the RICO statute, this is it.").

religious doctrine must be decided before it can be determined whether the defendants' acts were wrongful." 566 F. Supp. 555 at 558. "The first RICO claim, for example, alleges misuse and conversion of Congregational funds. But if applicable religious law authorized defendants to expend those funds, the claim must fail. Resolution of the other allegations in the complaint would require similar, judicially proscribed, determinations of religious tenets." Id. Similarly here, because "an issue of religious doctrine must be decided before it can be determined whether the defendants' acts were wrongful," id., plaintiff's RICO claims must be dismissed.

### 4. Breach of Agency Agreement

Plaintiff's claim for breach of agency agreement is premised on the allegation that "Rev. Moon made it clear that Sean Moon . . . exercise[d] full control and authority over Family Federation," FAC ¶ 176, and on defendants' purported "refus[al] to acknowledge Sean Moon's authority to act as agent for Family Federation," FAC ¶ 175. As with plaintiff's other claims, resolution of this claim turns on the validity of Rev. Moon's purported appointment of Sean Moon as "successor Leader" of a religious organization, and thus cannot permissibly be resolved in a civil forum.[26]

---

[26] The application of agency principles to church disputes can raise concerns similar to those that arise in the context of intrachurch fiduciary claims. See, e.g., Swanson v. Roman Catholic Bishop of Portland, 1997 ME 63, ¶ 10, 692 A.2d 441, 443 ("When a civil court undertakes to compare the relationship between a religious institution and its clergy with the agency

### 5. Defamation

Plaintiff asserts defamation claims on the basis of two statements that purportedly challenge plaintiff's authority as granted by Rev. Moon. See FAC ¶¶ 196, 208-09. The first defamation claim, which is based on the contents of a letter circulated in April of 2015, is time-barred under New York's one-year statute of limitations. NY CPLR § 215(3). With respect to the statements contained in the February 2018 press release -- namely, that "[s]ince the death of Rev. Moon back in 2012, Family Federation has been led by Mrs. Hak Ja Han Moon, the co-founder," FAC Ex. 4 at 2 -- the Court would not be able to engage the merits of that claim without running afoul of the First Amendment.

"It is axiomatic, of course, that truth is an absolute defense to a defamation claim." Martin v. Hearst Corp., 777 F.3d 546, 552 (2d Cir. 2015). Because the Court may not, consistent with the First Amendment, pass upon the truth or falsity of statements concerning plaintiff's or Mrs. Moon's purported religious standing, plaintiff's remaining defamation claim must be dismissed. Cf. Kavanagh, 997 F. Supp. 2d at 250 ("Where a court or jury would have to determine the truth of the defendants' statements . . . and, in doing so, would examine and weigh

---

relationship of the business world, secular duties are necessarily introduced into the ecclesiastical relationship and the risk of constitutional violation is evident.").

competing views of church doctrine, the result is entanglement in a matter of ecclesiastical concern that is barred by the First Amendment") (internal quotation marks omitted).

**6.    Violation of New York State's Whistleblower Statute**

Finally, plaintiff alleges that he "function[ed] as a whistleblower [by] exposing the improper conduct of those claiming power within Family Federation and the Unification Church," FAC ¶ 82, including that they were "dishonoring the directions and teachings of Rev. Moon to curry favor with Mrs. Moon and preserve their resulting political power and compensation," FAC ¶ 260. Because defendants purportedly suspended plaintiff from his role as International President of Family Federation "[i]n direct retaliation" for exposing such conduct, plaintiff asserts a violation of N.Y. Not-for-Profit Corp. Law ("NPCL") § 715-b(a), which requires certain corporations to "adopt . . . a whistleblower policy to protect from retaliation persons who report suspected improper conduct." NPCL § 715-b(a).

It is unclear that there even exists a private right of action under NPCL § 715-b(a). See Joshi v. Trustees of Columbia Univ. in City of New York, No. 17 Civ. 4112 (JGK), 2018 WL 2417846, at *10 (S.D.N.Y. May 29, 2018) (noting that "Section 715-b does not contain an express private right of action for employees of not-for-profit corporations who report suspected improper conduct and are the subject of retaliation" and that "[t]here is disagreement

within the New York State Supreme Court over whether Section 715-b implicitly provides a private right of action"). Assuming, *arguendo*, that an implied private right of action exists under Section 715-b for non-profit employees and that plaintiff would have standing to assert such a claim,[27] both the purported "misdeeds of top management members" (*i.e.*, "dishonoring the directions and teachings of Rev. Moon," FAC ¶ 260) and defendants' allegedly retaliatory actions (*i.e.*, suspending plaintiff from his position within Family Federation and "intimidat[ing] [plaintiff] by asking him to go along with Mrs. Moon's exercise of authority in violation of Rev. Moon's appointment," FAC ¶ 261) -- turn once again on the threshold premise that plaintiff, rather than his mother, is the rightful leader of Family Federation.

### D. The "Fraud or Collusion" Exception

Plaintiff maintains that even if the doctrine of ecclesiastical abstention would otherwise preclude this court from exercising subject matter jurisdiction, his claims are susceptible to judicial review under the so-called "fraud or collusion"

---

[27] At least for purposes of defendants' alleged violations of NPCL § 715-b(a), plaintiff maintains that in addition to serving as a Director of HSA-UWC (USA) and "Leader" of both Family Federation and HSA-UWC, he also was an employee of both HSA-UWC (USA) and Family Federation. FAC ¶ 259.

Somewhat at odds with plaintiff's purported entitlement to whistleblower protections is plaintiff's contention that, in response to the improper conduct of certain (unidentified) Unification Church leaders, plaintiff "asserted and threatened to exercise his power as Leader to remove any management members who failed to conduct themselves lawfully under the church's practices, procedures and policies." FAC ¶ 262.

exception to the general rule of judicial non-interference in ecclesiastical matters.  See ECF No. 71 at 7-8.  Though the precise contours of the "fraud or collusion" exception are unclear,[28] the Supreme Court in Milivojevich provided for the possibility of "marginal civil court review [of church disputes] under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith *for secular purposes*."  426 U.S. at 713 (emphasis added). Here, any allegations of fraud pertain not to secular activities but to defendants' purported efforts to, *inter alia*, remove plaintiff from his position as "Leader" of the Unification Church and related religious entities.  To the extent the "narrow exception" that plaintiff invokes exists in the first instance, it would only apply where, unlike here, "no ecclesiastical determinations are necessary."  Ram v. Lal, 906 F. Supp. 2d 59, 70 (E.D.N.Y. 2012).

*   *   *

In dismissing plaintiff's complaint, the Court is not unmindful of the concern, reflected in the case law and academic literature, that deeming cases nonjusticiable on the basis of ecclesiastical abstention will in certain instances leave aggrieved parties without a forum for the adjudication of their

---

[28] Plaintiff fails to cite (and this Court has been unable to identify) a single case applying the "fraud or collusion" exception as the basis for civil court intervention in an otherwise nonjusticiable church controversy.

claims. See, e.g., Congregation Yetev Lev D'Satmar, Inc. v. Kahana, 879 N.E.2d 1282, 1286 (N.Y. 2007) (Smith, J., dissenting) (describing the majority's determination that the case was nonjusticiable on the basis of ecclesiastical abstention as "a drastic measure, because when a case is nonjusticiable it means the wrong committed, if there is one, cannot be remedied anywhere."). The interests of aggrieved parties in obtaining civil court adjudication of their claims must nevertheless be balanced against the strong First Amendment interests favoring judicial non-intervention in matters of ecclesiastical concern. Particularly where, as here, adjudication would impliedly endorse a litigant's efforts -- using the guise of the neutral principles approach -- to invoke a civil court's assistance in resolving a dispute that is essentially religious in character, that balance tilts strongly in favor of judicial non-intervention.

Perhaps most problematically, resolving plaintiff's claims would require a ruling in favor of the views of one faction of a religious organization over those of another on an issue "at the core of ecclesiastical concern," Milivojevich, 426 U.S. at 717. Because "[t]he First Amendment serves to prevent exactly this sort of picking of winners in ecclesiastical matters," Kavanagh, 997 F. Supp. 2d at 254, this action must be, and is, dismissed.

### III. Conclusion

Having concluded that the ecclesiastical abstention doctrine bars review of the claims in this case, defendants' motions to dismiss are granted. Plaintiff's motion to extend the 90-day service deadline and excuse late service pursuant to Federal Rule of Civil Procedure 4(m) is denied as moot, and the Clerk of Court is respectfully requested to terminate all pending motions.

Dated:    New York, New York
           December 19, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE